# United States Bankruptcy Appellate Panel
## For the Eighth Circuit

_____

No. 14-6043

_____

In re: Michael Robert Wigley

*Debtor*

------------------------------

Lariat Companies, Inc.

*Claimant - Appellant*

v.

Michael Robert Wigley

*Debtor - Appellee*

_____

Appeal from United States Bankruptcy Court
for the District of Minnesota - Minneapolis

_____

Submitted: April 23, 2015
Filed: June 19, 2015

_____

Before FEDERMAN, Chief Judge, NAIL and SHODEEN, Bankruptcy Judges.

_____

NAIL, Bankruptcy Judge.

Lariat Companies, Inc. ("Lariat") appeals the November 10, 2014 order of the bankruptcy court capping Lariat's claim against Debtor Michael Robert Wigley ("Debtor") at $445,272.93. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

In 2008, Lariat, as lessor, and Baja Sol Cantina EP, LLC ("Baja Sol"), as lessee, entered into a ten-year lease of commercial real property in Hennepin County, Minnesota. Debtor, who had formed Baja Sol to operate a restaurant on the premises, personally guaranteed Baja Sol's performance under the lease.

Baja Sol defaulted under the lease, and Lariat evicted it in July 2010. Lariat then sued Baja Sol and Debtor to recover damages under the lease and the guaranty, respectively. On Lariat's motion for summary judgment, the Hennepin County District Court awarded Lariat $2,224,237.00 in damages, plus pre- and post-judgment interest and attorney fees. Baja Sol and Debtor appealed, and the Minnesota Court of Appeals affirmed the district court's judgment.

Further litigation ensued. In November 2011, Lariat and two other creditors filed an involuntary chapter 7 petition against Debtor. Pursuant to the parties' agreement, that case was dismissed in March 2012.

The day after they filed the involuntary chapter 7 petition against Debtor, the same three creditors filed a lawsuit against Debtor's wife in Hennepin County District Court. After the involuntary petition was dismissed, they added Debtor as a co-defendant. Following a two-day trial, the district court held Debtor and his wife

jointly and severally liable for various fraudulent transfers totaling $795,098.00 and awarded Lariat[1] that sum plus statutory interest, costs, and disbursements.

In March 2013, Debtor filed his own lawsuit against Lariat in Hennepin County District Court. Lariat characterizes that lawsuit as a collateral attack on its judgment against Baja Sol and Debtor. The district court seemingly agreed: In July 2013, it concluded Debtor's lawsuit was barred by collateral estoppel and dismissed his complaint. Debtor appealed. That appeal, stayed by the filing of Debtor's chapter 11 case, is pending.

In January 2014, Baja Sol filed a chapter 11 petition and commenced an adversary proceeding to enjoin Lariat from attempting to enforce its judgment against Debtor. The bankruptcy court denied Baja Sol's request for a preliminary injunction and, on Lariat's motion, dismissed the adversary proceeding. On the United States Trustee's motion, Baja Sol's chapter 11 case was dismissed in June 2014.

In February 2014, Debtor filed his own chapter 11 petition. Lariat filed a proof of claim for $1,734,539.00. Debtor objected to Lariat's claim on two grounds: (1) the amount sought based on Debtor's personal guaranty of Baja Sol's performance under the lease between Lariat and Baja Sol exceeded the amount allowable under 11 U.S.C. § 502(b)(6); and (2) the amount sought based on the various fraudulent transfers from Debtor to his wife were duplicative of, and subject to the same limitation as, the amount sought based on Debtor's personal guaranty of Baja Sol's performance under the lease between Lariat and Baja Sol. Shortly thereafter, Lariat filed an amended proof of claim for $1,610,787.00.

The bankruptcy court sustained Debtor's objection and capped Lariat's claim at $445,272.93. Debtor appealed.

---

[1]The other two creditors had settled their claims.

## STANDARD OF REVIEW

The relevant facts are not in dispute. We review the bankruptcy court's conclusions of law *de novo*. *Pierce v. Collection Assocs., Inc.* (*In re Pierce*), 779 F.3d 814, 817 (8th Cir. 2015).

## DISCUSSION

If a party in interest objects to a claim,

> the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that–

> . . .

> (6) if such claim is the claim of a lessor for damages *resulting from the termination of a lease of real property*, such claim exceeds–

>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of–

>>> (i) the date of the filing of the petition; and

>>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b) (emphasis added). Section 502(b)(6)'s cap on a landlord's damages is "designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." S. Rep. No. 95-989, at 63 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849.

The Ninth Circuit Court of Appeals has suggested a "simple test" for determining whether damages result from *rejection* of a lease:[2] "Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?" *Saddleback Valley Community Church v. El Toro Materials Co.* (*In re El Toro Materials Co.*), 504 F.3d 978, 981 (9th Cir. 2007). We suggest an equally simple test for cases involving, not a post-petition rejection of a lease, but a pre-petition termination of a lease: Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the lease had not been terminated?

In this case, Lariat's claim comprises four elements: (1) $172,243.11 for unpaid rent, common area maintenance, and late fees through the eviction date, as found by the Hennepin County District Court, and $54,844.00 for interest thereon to February 10, 2014, the date on which Debtor filed his chapter 11 petition; (2) $308,805.00 for fifteen months of post-eviction rent per § 502(b)(6)(A) and $70,306.00 for interest thereon to February 10, 2014; (3) $185,829.00 for attorney fees, costs, and disbursements, including interest thereon to February 10, 2014; and (4) $801,415.22 for Debtor's liability for the various fraudulent transfers to his wife and $17,346.00 for post-petition interest thereon to February 10, 2014.

_____

[2]With certain exceptions, "[a] trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

With respect to the first element of Lariat's claim, Debtor objected to that portion of the $172,243.11 that represented late charges and an "eviction fee," which totaled $32,394.40, and further objected to the entire $54,844.00 of interest.[3]  In sustaining Debtor's objection to these sums, the bankruptcy court concluded "the interest, late charges and eviction fees relating to the repossession date are claims for damages resulting from termination of the lease" and were thus subject to § 502(b)(6)'s cap.  We respectfully disagree.

The parties agree the lease was terminated in July 2010, when Lariat evicted Baja Sol from the premises.  Would Lariat have the same claim against Baja Sol (and through his guaranty, Debtor) for the unpaid rent, common area maintenance, late fees, and interest thereon if the lease had not been terminated?  Yes.

Lariat is seeking unpaid rent, common area maintenance, and late fees only through the eviction date.  Because these items accrued prior to termination of the lease, they cannot be said to have resulted from termination of the lease.[4]  *In re MDC Systems, Inc.*, 488 B.R. 74, 96-97 (Bankr. E.D. Pa. 2013); *In re Dronebarger*, Bankr. No. 10-10889-HCM, 2011 WL 350479, at *17 (Bankr. W.D. Tex. Jan. 31, 2011).  The pre- and post-judgment interest thereon is derivative of the amounts awarded for unpaid rent, common area maintenance, and late fees.  Because those amounts did not result from termination of the lease, the interest thereon cannot be said to have resulted from termination of the lease, either.  *Dronebarger*, 2011 WL 350479, at

---

[3]Debtor agrees Lariat would be allowed the unpaid rent under § 502(b)(6)(B).

[4]In its description of the items comprising this element of its claim, Lariat does not specifically refer to the eviction fee (amounting to $322.00) about which Debtor complained.  While its name might suggest otherwise, the record indicates this fee accrued in June 2010, prior to termination of the lease.  Consequently, it cannot be said to have resulted from termination of the lease, either.

*17. Lariat's claim for the various components of this element of its claim is thus not subject to § 502(b)(6)'s cap.

With respect to the second element of Lariat's claim, Debtor agreed with Lariat's calculation that $308,805.00 was allowable for "future rents" under § 502(b)(6)(A), but objected to the $70,306.00 of interest thereon. In sustaining Debtor's objection, the bankruptcy court concluded "[t]he interest charge constitutes damages resulting from the termination of the lease[.]" We agree.

Would Lariat have the same claim against Baja Sol (and through his guaranty, Debtor) for interest on the future rents if the lease had not been terminated? No.

If the lease had not been terminated, Lariat would not have a claim for future rents, and without a claim for future rents, Lariat would not have a claim for interest thereon. Lariat's claim for interest on its future rents thus resulted from termination of the lease and is subject to § 502(b)(6)(A)'s cap.

With respect to the third element of Lariat's claim, Debtor objected to any allowance for attorney fees, costs, and disbursements. In sustaining Debtor's objection, the bankruptcy court concluded "these claims are not outside the scope of [§] 502(b)(6) as not arising from a lease termination." We respectfully disagree, at least to the extent of the attorney fees, costs, and disbursements the district court awarded Lariat in the state court action to recover damages under the lease and guaranty.

Would Lariat have the same claim against Baja Sol (and through his guaranty, Debtor) for those attorney fees, costs, and disbursements if the lease had not been terminated? Yes.

Because the damages comprising the first element of Lariat's claim (unpaid rent, common area maintenance, and late fees) accrued prior to termination of the lease and thus cannot be said to have resulted from termination of the lease, the related attorney fees, costs, and disbursements–and the pre-petition interest thereon–likewise cannot be said to have resulted from termination of the lease. *Kupfer v. Salma* (*In re Kupfer*), 526 B.R. 812, 820-21 (N.D. Cal. 2014); *In re Rock & Republic Enters., Inc.*, Bankr. No. 10-11728, 2011 WL 2471000, at *25 (Bankr. S.D.N.Y. June 20, 2011); *MDC Systems*, 488 B.R. at 96-97; *Dronebarger*, 2011 WL 350479, at *17. Lariat's claim for these attorney fees, costs, and disbursements–and the pre-petition interest thereon–is thus not subject to § 502(b)(6)'s cap.

As for the balance of the attorney fees, costs, and disbursements that comprise this element of Lariat's claim, Debtor's objection was not limited to § 502(b)(6). Specifically, Debtor also argued Lariat had not identified any basis on which Debtor could be held liable for Lariat's attorney fees, costs, and disbursements, other than those the district court awarded Lariat in the state court action to recover damages under the lease and guaranty. Because it concluded all the requested attorney fees, costs, and disbursements were subject to § 502(b)(6)'s cap, the bankruptcy court did not reach this question. On remand, the bankruptcy court will therefore need to first determine whether Lariat is entitled, under the lease or otherwise, to the balance of the attorney fees, costs, and disbursements comprising this element of Lariat's claim and then determine whether Lariat would have the same claim against Baja Sol (and through his guaranty, Debtor) for these attorney fees, costs, and disbursements if the lease had not been terminated.

With respect to the fourth and final element of Lariat's claim, Debtor objected to any allowance for Debtor's liability for the various fraudulent transfers to his wife. In sustaining Debtor's objection, the bankruptcy court concluded the state court judgment based on the fraudulent transfers was duplicative of the earlier state court judgment awarding Lariat damages for Baja Sol's breach of the lease. We agree.

The Uniform Fraudulent Transfer Act, as adopted by the Minnesota legislature, MINN. STAT. §§ 513.41-513.51, does not create a "new" claim.[5]  "The Minnesota Uniform Fraudulent Transfer Act is not substantive in nature, but instead *merely confers an alternate remedy for protecting preexisting creditor rights.*  The creditor rights a party seeks to enforce must exist under independent law, such as contract law."  *Deford v. Soo Line R. Co.*, 867 F.2d 1080, 1087 (8th Cir. 1989) (citation therein) (emphasis added).

Lariat's argument to the contrary and the cases offered in support of its argument are not persuasive.  For example, it is true the Seventh Circuit Court of Appeals has said–in a case involving 11 U.S.C. § 523(a)(2)(A) (which excepts from discharge, *inter alia*, a debt for money, property or services obtained by a debtor's actual fraud)–a debtor's "actual fraud would give rise to a new debt, nondischargeable because created by fraud[.]"  *McClellan v. Cantrell*, 217 F.3d 890, 895 (7th Cir. 2000).  However, the court went on to say such a debt "would be a new debt *only to the extent of the value of the security that he conveyed, for that would be the only debt created by the fraud itself.*"  *Id.* (emphasis added).  That is not the situation presented in this case:  Nothing in the record suggests Debtor transferred any property in which Lariat held a security interest.

It is also true the Ohio Court of Appeals has said–in a case involving Ohio law–"courts have allowed creditors to recover compensatory damages in fraudulent transfer cases where a judgment has already been rendered against a debtor and has not been paid."  *D.A.N. Joint Venture III, L.P. v. Med-XS Solutions, Inc.*, No. 2011-L-

---

[5]Effective August 1, 2015, this act will be known as the Uniform Voidable Transactions Act, and many of its provisions will be amended.  2015 Minn. Sess. Laws Serv. Ch. 17 (S.F. 1816) (West).

056, 2012 WL 764236, at *8 (Ohio App. Mar. 12, 2012) (citations therein).[6] However, the court also said:

> Regarding duplicative damages, the fact that a plaintiff has separate and independent causes of action in contract and in tort does not permit him to recover more than the amount of damage actually suffered as a consequence of the injury resulting from the wrongful breach of his contract. *A plaintiff must allege and prove the existence of additional damages attributable to the defendant to be awarded damages on each of the separate claims.*

*Id.* at *7 (citation and internal quotation marks omitted) (emphasis added). Nothing in the record suggests Lariat alleged, much less proved, the existence of additional damages attributable to Debtor.

Lastly, in citing *JCA Partnership v. Wenzel Plumbing & Heating, Inc.*, 978 F.2d 1056 (8th Cir. 1992), in support of the proposition that a fraudulent transfer is a separate wrong, Lariat reads far too much into that decision. In considering whether the doctrine of election of remedies barred a breach of contract claim, the court only held:

> The doctrine of election of remedies precludes double redress for a single wrong, but the previous fraudulent conveyance action and this breach of contract claim address separate wrongs. The alleged "wrong" in the fraudulent conveyance action was the sheriff's sale of the property to the mortgagee and the mortgagee's subsequent transfer to [a third party] for less than its reasonable equivalent value. The damages sought were alleged to be

---

[6]*D.A.N. Joint Venture III* also involved a fraudulent transfer of a secured creditor's collateral. *Id.* at *1.

the difference between the fair market value of the property and the amount that [the mortgagee] and later [the third party] paid for the property. In contrast, [the vendor's] "wrong" in this breach of contract action arose from its failure to deliver possession to [the vendee] after he cured his default. Although [the vendor] could not deliver possession because the mortgagee had possession, that was due to [the vendor's] default and not legally due to [the vendee's] default. Furthermore, [the vendor] was not even a party to the fraudulent conveyance action. *Applying "concepts of fairness," the two actions appear to address separate wrongs and separate parties*. Therefore, the breach of contract claim against [the vendor] is not barred by the doctrine of election of remedies.

*Id.* at 1061 (emphasis added). This is a far cry from saying a fraudulent transfer creates a new claim.[7]

One final item merits mention. Both parties agree there is a discrepancy between the amount of the claim allowed by the bankruptcy court and the difference between the amount of Lariat's amended proof of claim and the amounts the bankruptcy court disallowed. Lariat says the difference is $3,379.67; Debtor seems to say the difference is $3,380.78. On remand, the bankruptcy court will need to either explain the discrepancy or determine whether Lariat or Debtor is correct and adjust the amount of Lariat's allowed claim accordingly.

---

[7]Lariat cites *JCA Partnership* and another case, *Sherman v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348 (8th Cir. 1995), in support of the proposition that the Eighth Circuit Court of Appeals has shown a "distinct reluctance" to hold that fraudulent transfer judgments duplicate any underlying liability. We do not read either of these cases to support this proposition.

## CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

———————————————————